**Norfolk**

WILLIAM B. TORO, JR.
and
H S J ENTERPRISES, INC., T/A VIDEORAMA

v.

CITY OF NORFOLK

Nos. 0229-90-1
0230-90-1

Decided March 31, 1992

COUNSEL

Paul M. Lipkin (Mary G. Commander; Goldblatt, Lipkin & Cohen, P.C., on brief), for appellant.

Andre A. Foreman, Deputy City Attorney (Phillip R. Trapani, City Attorney, on brief), for appellee.

OPINION

**COLEMAN, J.**—HSJ Enterprises, Inc., trading as Videorama, and William B. Toro, Jr., its president (collectively referred to as Toro), were convicted in a jury trial on sixteen counts of selling or renting obscene videotapes in violation of the criminal code of the City of Norfolk.[1] The misdemeanor convictions resulted in fines totalling $13,000. In this appeal, Toro challenges the trial court's rulings excluding evidence he offered to defend against the allegations that the sex and nudity depicted in the videotapes was obscene, including: (1) a public opinion survey poll intended to define the contemporary community standards in Norfolk toward sexually explicit materials; (2) the proffered expert testimony of Dr. Joseph P. Scott, a sociologist, that was offered to explain to the jury the results of the Norfolk survey; and (3) the proffered testimony of Father Richard Risser, an Episcopal priest and a licensed marriage counselor who used sexually explicit videotapes in marriage counseling, to prove that the videotapes had scientific value. We hold that the trial court did not err by excluding the evidence. Accordingly, we affirm the convictions.

---

[1] The Code of the City of Norfolk provides:

**Sec. 28-4. Production, publication, sale, possession, etc., of obscene items.**

(a) It shall be unlawful for any person in this city knowingly to:

&ast; &ast; &ast;

(3) Publish, sell, rent, lend, transport within this city or distribute or exhibit any obscene item, or offer to do any of these things;

&ast; &ast; &ast;

(b) For the purposes of this section, "distribute" shall mean delivery in person, by mail, messenger or by any other means by which obscene items may pass from one person to another.

**Sec. 28-2. "Obscene" defined.**

The word "obscene," as used in this article shall mean that which, considered as a whole, has as its dominant theme or purpose an appeal to prurient interest in sex; that is, a shameful or morbid interest in nudity, sexual conduct, sexual excitement, excretory functions or products thereof or sadomasochistic abuse, and which goes substantially beyond customary limits of candor in description or representation of such matters and which, taken as a whole, does not have serious literary, artistic, political or scientific value.

**Sec. 28-3. Obscene items enumerated.**

For the purpose of this article, obscene items shall include:

&ast; &ast; &ast;

(2) Any obscene leaflet, pamphlet, magazine, booklet, picture, painting, drawing, photograph, film, negative, slide, motion picture. . . .

HSJ Enterprises operates the Videorama store in the City of Norfolk. The store rents and sells videocassette tapes and various audio-visual equipment and accessories. William Toro, president of HSJ Enterprises, manages the store. Because of a complaint lodged with the Norfolk Police Department that some of the videotapes in the store were of an unacceptable "adult" nature, the Vice and Narcotics Division investigated the nature of the material which Toro rented and sold. In the course of several visits to Videorama, an undercover investigator purchased two tapes entitled "I Like to Watch" and "Swedish Erotica" and rented six other tapes. The sale and rental of the eight videotapes were the basis for the charges against Toro.

The issue at trial was whether the content of the eight videotapes was obscene. All eight tapes were admitted into evidence. The jury was allowed to view "I Like to Watch" and "Swedish Erotica." The defendant stipulated that the jury's decision whether those two videotapes were obscene would govern whether the other six were obscene, since they contained material of substantially the same nature.

Since Toro does not challenge in this appeal that the evidence was sufficient to permit the jury to find the videos obscene within the test enunciated in *Miller v. California*, 413 U.S. 15 (1973), we need only briefly describe the two films shown the jury, "I Like to Watch" and "Swedish Erotica." Both films have no plot other than they depict very graphically a series of sexual encounters between an array of men and women, in pairs or groups, performing various sex acts, including vaginal and anal intercourse, cunnilingus, fellatio, lesbian sex, male and female masturbation, inanimate vaginal penetration, and various combinations of sex acts performed with multiple partners. Both films frequently showed close-up shots of the male and female genitalia and of the male ejaculating.

## OBSCENITY

*Miller* sets forth a three part test defining obscenity. Material is obscene when: (1) the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (2) the work describes, in a patently offensive way, specifically defined sexual conduct; and (3) the work, taken as a whole, lacks serious literary, artistic, politi-

cal, or scientific value. *Id.* at 24. The jury was instructed that it would be required to determine contemporary community standards with respect to material that depicted nudity and sex and to decide whether the material in each of the eight videotapes violated those standards.

## PUBLIC OPINION SURVEY

As part of his defense, Toro attempted to introduce evidence in respect to the first and third prongs of the *Miller* test. He sought to define the contemporary Norfolk community standard for obscenity and to show that the videotapes did not violate that standard. He also sought to show that the videotapes had serious scientific value.

In order to establish the Norfolk community standards regarding sexually explicit materials, Toro employed Dr. Joseph P. Scott to conduct a public opinion survey of a number of Norfolk citizens. Dr. Scott, a professor of sociology at Ohio State University, is also an experienced pollster. He designed a survey to be conducted in Norfolk. Dr. Scott has testified in many obscenity trials. He retained Saperstein Associates, a Columbus, Ohio based firm, to conduct a telephone poll from a list of randomly selected Norfolk residents. The interviewers began the poll by asking how long each person had lived in Norfolk and whether the person was informed as to current events in Norfolk. After other general background questions, including religious and political affiliations, the interviewer prefaced specific questions about videotapes portraying nudity and sex with the following:

The next few questions deal with adult X-rated videos. These videos have little or no plot. Their contents are primarily graphic depictions of nudity and sex showing a variety of actual sexual activities, including: sexual intercourse, ejaculation, oral sex, anal sex, use of vibrators, lesbian sex, group sex and variations of these by adult performers. No minors are involved in any of these videos, and they are available for purchase, rental, or viewing at retail establishments only by adults who desire them.

The interviewers then asked six questions:

(1) In your opinion, has the portrayal of nudity and sex, in adult X-rated videos available only to adults, become more or less acceptable in recent years?

(2) Do you agree or disagree that the portrayal of nudity and sex in such adult X-rated videos is tolerated in Norfolk for those adults who may want to view them?

(3) Is it or is it not acceptable to you, for adults in your community to obtain and view adult videos, as described, if they should want to?

(4) Is it or is it not acceptable in your community, for you to obtain and view adult videos, as described, if you should want to?

(5) Would your viewing of adult videos depicting actual sex acts in great detail and with close-ups of the sexual organs, as described, appeal to any unhealthy, shameful or morbid interest in sex that you might have?

(6) Would you find that the viewing of adult videos depicting actual sex acts, as previously described, appeals to an unhealthy, shameful, or morbid, interest in sex?

The pollster tabulated the results and reported the number and percentage of Norfolk citizens polled who answered each question affirmatively or negatively. The trial court ruled that the statistical results of the survey were inadmissible.

We hold that the trial court did not err in excluding the results of the survey because they were not relevant for two reasons. First, the survey questions did not fully and adequately describe the nature of the content of the eight videotapes or similar material. Second, the survey questions did not attempt to ascertain whether these eight videotapes, or others equivalent to them in content, depicted nudity and sex in a manner acceptable to the contemporary community standards.

■ The United States Court of Appeals for the Fourth Circuit in *United States v. Pryba*, 900 F.2d 748, 757 (4th Cir.), *cert. denied*, 498 U.S. 924 (1990), addressed a situation involving the results of a public opinion poll virtually identical to that conducted in Norfolk. The Circuit Court in *Pryba* expressly adopted the reasoning of the district court, which stated:

Courts have recognized that properly conducted public opinion surveys may be useful in gauging community stan-

dards for the purposes of determining whether the materials at issue are obscene. To be admissible, however, a public opinion poll must be relevant; it must ask questions concerning *the materials involved in the case or works that are "clearly akin" to the charged materials.* Moreover, the poll must address whether the interviewee believes that *the materials at issue or similar materials* depict nudity and sex in an acceptable manner.

*United States v. Pryba*, 678 F. Supp. 1225, 1229 (E.D. Va. 1988) (citations omitted) (emphasis added). The appellants in *Pryba*, charged with selling obscene materials, sought to introduce the results of a survey[2] to show that the materials were acceptable by the local community's standards. *Pryba*, 900 F.2d at 757. The Fourth Circuit held that "the questions presented by the pollsters in conducting their surveys did not accurately and fully describe the challenged materials being sold by the appellants. Asking a person in a telephone interview as to whether one is offended by nudity, is a far cry from showing the materials . . . and then asking if they are offensive." *Id.*

Like the poll conducted in *Pryba*, the poll conducted at Dr. Scott's direction on Toro's behalf in Norfolk gave a cursory description of the contents of the films. Even though the trial court stated that the descriptive language that accompanied Toro's survey provided a fair characterization of the two videotapes viewed by the jury, the characterization was, nevertheless, inadequate to depict the display of sex and nudity shown by the tapes, "I Like to Watch" and "Swedish Erotica." The general verbal description of the various sexual acts contained in the questions that attempted to describe the videotapes did not depict, and could not capture, the graphic display of sexual acts shown on a videotape, complete with sound. However descriptive the language of the poll may have been, it failed "to convey the impact of the visual image." *Pryba*, 678 F. Supp. at 1229.

Also, like the poll conducted in *Pryba*, the polling conducted on behalf of Toro did not address community acceptance of the depictions of sex and nudity portrayed in the videotapes obtained from Videorama or other similar tapes. The questions addressed,

---

[2] See *United States v. Pryba*, 678 F. Supp. at 1228, for the text of the challenged survey, which is strikingly similar to the survey offered by Toro.

instead, community tolerance in general toward nudity and sex and X-rated videotapes. The fact that the citizens in a community, such as Norfolk, have grown to tolerate having video materials in the community that display nudity or sex in a patently offensive way does not mean that the citizens find sexually explicit materials such as that portrayed in "I Like to Watch" or "Swedish Erotica" acceptable when gauged by contemporary community standards.

> The fact that depictions of nudity and sex may have become more acceptable in recent years [in Norfolk] does not bear on whether the average adult person in the community, applying contemporary community standards, would find that the charged materials appeal to the prurient interest or are patently offensive.

> It is axiomatic that community tolerance or availability does not equate with acceptability.

*Id.* at 1230.

Because the poll did not fully and adequately describe the content of the videos, did not convey the impact of the scenes portrayed in the videotapes, and failed to measure community acceptance of the tapes in question or those with substantially similar content, the results of the poll were not relevant. Therefore, the trial court did not err by excluding the poll.

## EXPERT TESTIMONY

 It is well-settled that in obscenity prosecutions, an accused may introduce competent, material, and relevant expert testimony. *See Kaplan v. California*, 413 U.S. 115, 121 (1973); *see also Pryba*, 678 F. Supp. at 1231. Virginia courts are required to admit relevant and material evidence from a qualified expert in an obscenity prosecution. *Freeman v. Commonwealth*, 223 Va. 301, 313, 288 S.E.2d 461, 467-68 (1982); *see also Price v. Commonwealth*, 213 Va. 113, 189 S.E.2d 324 (1972). However, the United States Supreme Court has said that once the challenged materials are in evidence, a jury needs no assistance from experts on the issue of whether the material is obscene. *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 56 (1973). Nevertheless, even though two of the videotapes obtained from Toro had been shown to the jury,

material and relevant expert testimony on the criteria which define whether material is obscene would have been admissible in Toro's defense. Evidence of an expert witness may be relevant in proving contemporary community standards or whether the material lacks serious scientific, artistic, literary, or political value, or whether the material appeals to the prurient interest or defines sexual conduct in a patently offensive way. We agree with the trial judge, however, that the proffered results of the survey and the testimony of Dr. Scott were not relevant to prove the contemporary community standards in Norfolk.

### A. *Dr. Joseph P. Scott*

■ "The standard of review on appeal where the admissibility of expert testimony is challenged is whether the trial court abused its discretion." *Kern v. Commonwealth*, 2 Va. App. 84, 86, 341 S.E.2d 397, 398 (1986). Toro sought to introduce the testimony of Dr. Scott, as an expert witness, in order to explain the results of his survey and to establish community standards in Norfolk. Dr. Scott would have testified that, in his opinion, the videotapes for which Toro was being prosecuted did not offend or violate the contemporary Norfolk community standards, as he measured them from the survey results. The defense proffered a complete and thorough vitae showing Dr. Scott's educational and professional qualifications as a sociologist, which included extensive study and publication on the subject of pornography. While the proffered evidence showed that Dr. Scott is highly qualified as a sociologist and as an expert in the area of public attitudes toward sex, nudity, obscenity, and pornography, his only knowledge of the contemporary community standards in Norfolk was based on his analysis of the survey. He spent no time in Norfolk observing or studying community standards. He did not interview Norfolk residents to ascertain their views or opinions about the community standards of Norfolk citizens toward videotapes such as "I Like to Watch" or "Swedish Erotica." For the reasons we have previously stated, the survey and its results were inadmissible for a variety of reasons, among which were that the survey did not measure the community views toward the contents of the videos for which Toro was being prosecuted or videos substantially similar thereto. Consequently, Dr. Scott's testimony and opinion which were based exclusively on the poll were also inadmissible. Because Dr. Scott had no other knowledge of the Norfolk community standards, the

trial court did not err by excluding his testimony.

## B. *Father Richard Risser*

■ The court also refused to accept the testimony of Father Richard Risser. Toro did not formally proffer Father Risser's testimony; instead, defense counsel avowed what Father Risser's qualifications were and to what he would testify. An unchallenged avowal by counsel is a proper proffer. *Whittaker v. Commonwealth*, 217 Va. 966, 969, 234 S.E.2d 79, 81-82 (1977). According to the avowal of counsel, Father Risser is an Episcopal priest also trained and licensed as a marriage counsellor.[3] Toro offered Father Risser's testimony to show, under the third prong of the *Miller* test, that because Risser uses "[X]-rated films to help disjointed family couples" in marriage counseling, the videotapes at issue had redeeming serious scientific value. Although Toro's avowal was sufficient to show that Father Risser was qualified as a marriage counselor and to testify about acceptable counseling techniques for sexually "disjointed" or dysfunctional married couples,[4] the avowal was not sufficient to show that his testimony

---

[3] The avowal as to what Father Risser would testify was as follows:

MR. LIPKIN: I would have another expert that I would proffer.

THE COURT: I thought you said you had two.

MR. LIPKIN: You knocked one out, so I bring in another one. I'm still left with one to go.

THE COURT: You had four?

MR. LIPKIN: No, one more, Father Richard Risser, trained and licensed marriage counselor. He would testify to the value of the marriage counseling field.

THE COURT: The value?

MR. LIPKIN: The sexual compatibility of couples relations, married couples together, the value of a film of this kind in helping them get over family problems, value, the third prong.

THE COURT: Would you object to that, Mr. Foreman?

MR. FOREMAN: Yes, Your Honor, I would.

THE COURT: Objection sustained.

MR. LIPKIN: I would note my exception to that. This man in his training and in his practice of his training advocates the use of films, X-rated films to help disjointed family couples become sexually compatible with each other, and I think that that is the third prong of the Miller test.

THE COURT: With that I think we'll note your exception on that. I just think that not every medicine that might legally be prescribed can lawfully be sold over the counter in the teeth of an ordinance which prohibits it. I don't think we need to debate that, Mr. Lipkin. I'm going to note your exception to that.

[4] *See* Vol. 13, No. 1, Journal of Sex & Marital Therapy, pp. 64-72 (Spring 1987), *The Use of Audiovisual Materials in Sex Therapy: A Critical Overview* by Larry Neidigh, M.A., and Bill N. Kinder, Ph.D. (authors discuss the studies which have been conducted

was relevant to any material issue in the case. An appellant must demonstrate that the excluded evidence is relevant and material and that the party was entitled to have it introduced in order to establish on appeal that the trial court erred by excluding it. *Clark v. Sleet*, 99 Va. 381, 383, 38 S.E. 183, 183-84 (1901).

■ Toro offered Father Risser's testimony for the purpose of refuting the Commonwealth's contention that the videos, "taken as a whole, lack serious literary, artistic, political, or scientific value." If Risser's testimony tended to prove that the videos had serious social, scientific, or medical value, his testimony was relevant to prove a material issue, and the trial judge erred by excluding it. *See Freeman*, 223 Va. 301, 288 S.E.2d 461; *Price*, 213 Va. 113, 189 S.E.2d 324. "Trial courts must admit evidence which is material and relevant to prove or disprove an element of an offense or an affirmative defense, unless the evidence is not competent or is otherwise excluded by statute or rule of law." *Quinn v. Commonwealth*, 9 Va. App. 321, 323, 388 S.E.2d 268, 270 (1990).

> The ultimate inquiry in determining whether evidence is both material—tending to prove a matter which is properly at issue in the case—and relevant—tending to establish the proposition for which it is offered—is: Does the evidence tend to prove a proposition which is itself provable in the case?

*Johnson v. Commonwealth*, 2 Va. App. 598, 601, 347 S.E.2d 163, 165 (1986). "Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible." *Epperly v. Commonwealth*, 224 Va. 214, 230, 294 S.E.2d 882, 891 (1982).

The proffer of Father Risser's testimony did not tend to prove that the videos had serious social, scientific or medical value. The avowal did not indicate that Father Risser had seen or knew the graphic display of erotic sex portrayed in any of the videotapes which had been seized. The proffer that Father Risser used X-rated films to counsel sexually disjointed married couples did not

on using certain types of sexually explicit or erotic films as a developing technique in treating various types of sexual dysfunction). *See also* H. Kaplan, *The New Sex Therapy*, Ch. 12, The Therapeutic Experience, 204 (1974) ("Erotic films depicting sexual techniques are also being used increasingly, both in sex education and in sex therapy").

show or suggest that he would have considered these particular films suitable for his purposes. The trial judge did not abuse his discretion in rejecting the evidence of Father Richard Risser because his proffered testimony was not relevant to show that these films or films of this type would have been considered to have been suitable for use by him. *Kern*, 2 Va. App. at 86, 341 S.E.2d at 398. The proffer of Father Risser's testimony was insufficient to show that his testimony would be relevant to prove or refute a material issue in the case. Accordingly, the trial court did not err in excluding it. We affirm the convictions.

*Affirmed.*

Barrow, J., and Moon, J., concurred.